In re John Clifford MADIGAN, Jr., Debtor.

Aetna U.S. Healthcare, Inc., Appellant,

v.

John Clifford Madigan, Jr.; John S. Peterson, Chapter 7 Trustee, Appellees.

BAP No. WW–01–1240–MaMoR.

Bankruptcy No. 97–15323.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Oct. 24, 2001.

Decided Dec. 6, 2001.

Grant E. Courtney, Lane, Powell, Spears & Lubersky, Seattle, WA, for Aetna U.S. Healthcare, Inc.

Kevin R. Hansen, Wolfley Basden Hansen, P.S., Port Angeles, WA, for John Clifford Madigan, Jr.

Before: MARLAR, MONTALI, and RUSSELL, Bankruptcy Judges.

### OPINION

MARLAR, Bankruptcy Judge.

#### *INTRODUCTION*

In this equitable recoupment case, we are asked to determine if there is a "logical relationship" between two long-term disability ("LTD") claims which were separated by an intervening bankruptcy petition. The debtor asserted that the insurer had violated his discharge injunction by adjusting his postpetition benefits in order to recover its prepetition overpayments. The bankruptcy court denied recoupment to the insurer, holding that the two claims were different transactions. We AFFIRM.

#### *FACTS*

Debtor John Clifford Madigan, Jr. was employed by Boeing Company ("Boeing"), which participated in a group long-term disability insurance plan administered by Aetna U.S. Healthcare, Inc. ("Aetna"). The debtor was covered by Group Policy No. LTD–707 ("Policy"), which provided for monthly benefits payable to employees in the event of disability.

The Policy provided that the amount of benefits could be reduced if the employee became eligible for Social Security payments. In such an event, the Policy gave Aetna the right to recover from the employee the excess benefits, or to adjust for overpayments by deducting such excess amounts from "any subsequent monthly benefits payable to the employee."

The Policy defined "one period of total disability" as "[a]ny two separate periods of total disability which arise from the same or related causes and which are separated by less than six months of active work."

In 1996, the debtor applied for LTD benefits and, in connection therewith, signed a "Reimbursement Agreement" in which he promised, among other things, to reimburse Aetna for any overpayments.[1]

The debtor received LTD benefits from January 1996 through June 1997. The debtor also applied for Social Security ben-

---

1. Although the debtor has disputed this fact, the bankruptcy court found that the debtor made such a promise in 1996, and the debtor did not object or file a cross-appeal.

efits, and in June 1997, he received a retroactive lump sum payment of $17,400 from Social Security. He did not tell Aetna about the Social Security benefits.

On July 7, 1997, after Aetna learned about the Social Security benefits, it sent a demand letter to the debtor for reimbursement in the sum of $17,029.07. However, the debtor did not reimburse Aetna.

The debtor returned to work at Boeing in August 1997. On September 25, 1997, Aetna sent a letter to the debtor stating that his "eligibility for LTD terminate[d] August 25, 1997." Aetna again demanded payment of the balance of overpayments in the amount of $15,630.24 (having applied the final payment).

On November 18, 1997, the debtor filed a chapter 7 petition.[2] The debtor listed Aetna as an unsecured creditor. On his Statement of Financial Affairs, the debtor explained that he had used the Social Security lump sum payment to pay his debts. In 1998, the debtor received a discharge, and his no-asset bankruptcy case was closed.

In November 1999, the debtor applied a second time for disability benefits under the Policy. The record does not state, and it was not determined by the bankruptcy court, whether this application was for the same disability or a new disability. In

connection with this application, the debtor executed a new Reimbursement Agreement on November 26, 1999.[3]

The debtor was approved for benefits, effective November 1999, and began to receive reduced payments in April 2000. Aetna informed the debtor that it had applied the past-due benefits for the months of November 1999 through March 2000—a total of $3,836.70—to the 1997 $15,630.24 overpayment. Aetna also informed the debtor that it would continue to adjust future benefits to recover the $11,793.54 prepetition balance. On April 1, 2000, the debtor received a medical retirement.

In November 2000, the debtor filed a motion to reopen his bankruptcy case in order to file a complaint against Aetna for its alleged violation of the § 524 discharge injunction.[4] Aetna opposed the motion, arguing that it was entitled to equitable recoupment. Both parties filed supplemental briefs, affidavits and exhibits. The debtor explained that he suffered from depression and personality disorders, and described the suffering allegedly caused him by Aetna's withholding of benefits.

The bankruptcy court treated the pleadings as a motion for summary judgment, and at the January 12, 2001 hearing, ruled in favor of the debtor.[5]

---

**2.** Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, which make applicable certain Federal Rules of Civil Procedure.

**3.** Due to an accounting error, the debtor had *not* been automatically reinstated under the Policy when he returned to work at Boeing. As a result, before he could make a new claim, the debtor had to re-enroll. He did so in May 1999, and elected to pay 12 months of back premiums (to cover the 12–month preexisting illness clause). We do not believe

that such a ministerial error and the associated facts are material to our analysis.

**4.** Section 524 "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [debt discharged under section 727] as a personal liability of the debtor, whether or not discharge of such debt is waived." § 524(a)(2).

**5.** Both parties have waived any procedural defects resulting from the debtor's failure to file the proper adversary proceeding or contempt motion. *See* Fed.R.Bankr.P. 7001(7) (a proceeding to obtain injunctive or other equi-

Presuming that the debtor's illness was the same for both disability periods, the court nevertheless held that the two-year interval between those periods and the Policy's language created separate disability claim periods. Thus, it held that the overpayment for the first disability claim was not "logically related" to Aetna's reimbursement rights relative to the second disability claim, and therefore the "same transaction" requirement for equitable recoupment had not been met. Instead, the court concluded that Aetna's action was a prohibited postpetition setoff.

The court's order was entered on May 15, 2001, and, in relevant part, it found Aetna to be in violation of the discharge injunction of § 524, and ordered Aetna to pay the debtor $12,654.99—the amount withheld from the debtor's postpetition disability benefits through April 2001, with interest. Aetna timely appealed.

### ISSUE

Whether Aetna's prepetition right to overpayments under the first disability claim arose from the "same transaction" as the debtor's postpetition claim for disability benefits, such that equitable recoupment applied to the overpayments.

### STANDARD OF REVIEW

■ We review *de novo* the bankruptcy court's application of undisputed facts to the law concerning equitable recoupment. *Sims v. U.S. Dept. of Health and Human Servs. (In re TLC Hosps., Inc.)*, 224 F.3d 1008, 1011 n. 7 (9th Cir.2000) (adopting same standard as applied in underlying district court case, *Sims v. U.S. Dept. of Health and Human Servs. (In re TLC Hosps. Inc.)*, 225 B.R. 709, 709–10 (N.D.Cal.1998)).

■ The granting of a summary judgment is also reviewed *de novo*. *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1283 (9th Cir.1990). "We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material . fact and whether the district court correctly applied the relevant substantive law." *Id.;* Fed.R.Bankr.P. 7056/ Fed.R.Civ.P. 56(c).

### DISCUSSION

#### Recoupment

■ Equitable recoupment is a common law doctrine that is not expressly recog-

table relief is an adversary proceeding); Fed.R.Bankr.P. 7001(9) (a proceeding for declaratory relief concerning an injunction is an adversary proceeding); *See also Bassett v. Am. Gen. Fin., Inc. (In re Bassett)*, 255 B.R. 747, 754–55 (9th Cir. BAP 2000) and *Costa v. Welch (In re Costa)*, 172 B.R. 954, 965–66 (Bankr.E.D.Cal.1994) (holding that the proper procedure for enforcing the discharge injunction as well as for obtaining sanctions is through a contempt proceeding).

In any event, failure to dispose of a matter by an adversary proceeding normally is subject to review using a harmless error analysis. *USA/I.R.S. v. Valley Nat'l Bank (In re Decker)*, 199 B.R. 684, 689 (9th Cir. BAP 1996). Here, the bankruptcy court essentially provided all of the procedures involved in a motion for summary judgment. *See* Fed.R.Bankr.P.

9014 (allowing court to utilize selected adversary procedures in contested matters). The parties agreed that there were no genuine issues of material fact, and the court ruled on a matter of law.

The bankruptcy court had inherent authority to .adjudicate this matter pursuant to its equitable powers under § 105(a). *See Oregon v. Harmon (In re Harmon)*, 188 B.R. 421, 424 (9th Cir. BAP 1995) (application of the equitable doctrine of recoupment is discretionary with the bankruptcy court). These same equitable powers enabled the .court to fashion relief by effectively entering a disgorgement order, rather than .a money judgment. *See generally* 17 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Fed.Prac. & Proc.*, Juris.2d § 4106 (2001 Supp.).

754

nized in the Bankruptcy Code, but is preserved through judicial decisions. 5 *Collier on Bankruptcy* ¶ 553.10 (15th ed. rev. 2001). The bankruptcy trustee takes property subject to the rights of recoupment. *Megafoods Stores, Inc. v. Flagstaff Realty Assocs. (In re Flagstaff Realty Assocs.)*, 60 F.3d 1031, 1035 (3rd Cir.1995). *See also Reiter v. Cooper*, 507 U.S. 258, 265 n. 2, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (observing that courts have allowed the use of recoupment in bankruptcy cases).

■ Recoupment " 'is the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim.' " *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1399 (9th Cir.1996) (quoting 4 *Collier on Bankruptcy*, ¶ 553.03, at 553–15 (15th ed.1995)) (emphasis in original). It involves "netting out debt," *Oregon v. Harmon (In re Harmon)*, 188 B.R. 421, 425 (9th Cir. BAP 1995), and is allowed "because it would be inequitable not to allow the defendant to recoup those payments against the debtor's subsequent claim." *Newbery*, 95 F.3d at 1401; *Long Term Disability Plan of Hoffman–La Roche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238, 243 (Bankr.D.N.J.1989) ("[T]he application of recoupment goes to the equity of the claim.").

■ The justification for the defensive use of recoupment in bankruptcy is that there is no independent basis for a "debt," and therefore there is no "claim" against estate property. *Harmon,* 188 B.R. at 425; § 101(5) (claim is a "right to payment" or "right to an equitable remedy"); § 101(12) (" 'debt' means liability on a claim"). Since recoupment is neither a claim nor a debt, it is unaffected by either the automatic stay or the debtor's discharge. *Id.; TLC Hosps.*, 224 F.3d at

1011; *Newbery*, 95 F.3d at 1399–1400; *Mercy Hosp. of Watertown v. New York State Dept. of Social Servs.*, 171 B.R. 490, 494–95 (N.D.N.Y.1994); § 524.

■ In recoupment, the respective claims may arise either before or after the commencement of the bankruptcy case, but they must arise out of the same transaction. *Newbery*, 95 F.3d at 1399. The creditor is allowed "to assert that certain mutual claims extinguish one another ... in spite of the fact that they could not be 'setoff' under 11 U.S.C. § 553." *Lee v. Schweiker*, 739 F.2d 870, 875 (3rd Cir. 1984).

■ The "same transaction" requirement essentially distinguishes recoupment from "setoff" or "offset," a similar equitable doctrine of debt adjustment, governed by § 553, which requires the existence of mutual, *prepetition* debts. *Id.* Therefore, if Aetna is not entitled to recoupment, the debtor's bankruptcy discharge would prevent an offset of Aetna's discharged prepetition claim against the debtor against its postpetition obligation to the debtor. *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1539 & n. 4 (10th Cir.1990) (citing *Johnson v. Rutherford Hosp. (In re Johnson)*, 13 B.R. 185, 189 (Bankr. M.D.Tenn.1981)).

■ In this appeal, Aetna argues that recovery of the debtor's LTD overpayment falls within the common law doctrine of equitable recoupment because the prepetition overpayment arose out of the same transaction as the debtor's claim for postpetition LTD benefits. In the Ninth Circuit, in order to determine if two claims arose from the "same transaction," we must apply the "logical relationship" test. *TLC Hosps.*, 224 F.3d at 1012; *Newbery*, 95 F.3d at 1403.

### A. Logical Relationship Test

Historically, both recoupment and setoff functioned as equitable rules of joinder, enabling parties to litigate in one proceeding claims that would otherwise have been pursued separately. *Lee,* 739 F.2d at 875 & n. 5; 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed.Prac. & Proc.,* Civ.2d § 1401 (West 1990). Recoupment is the common law precursor of the compulsory counterclaim, whereas setoff is the precursor of the permissive counterclaim. *Id.*

 The common-law claim for recoupment is analogous to a "compulsory counterclaim interposed solely to defeat or diminish plaintiff's recovery." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra,* § 1409 at 50. The "logical relationship test" is applied under Fed. R.Civ.P. 13(a) to determine a compulsory counterclaim, *i.e.,* whether the claim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Bankr.P. 7013/Fed.R.Civ.P. 13(a); *Schulman v. State of Cal. (In re Lazar),* 237 F.3d 967, 979 (9th Cir.2001).

> A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant.

*Pinkstaff v. United States (In re Pinkstaff),* 974 F.2d 113, 115 (9th Cir.1992) (citation omitted).

In applying this standard, "courts have permitted a variety of obligations to be recouped against each other, requiring only that the obligations be sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party." 5 *Collier, supra,* ¶ 553.10[1].

 Under the "logical relationship" test, the word "transaction" is given a liberal and flexible construction. *See Newbery,* 95 F.3d at 1402 (citing *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926) and *Albright v. Gates,* 362 F.2d 928, 929 (9th Cir.1966)); *United States v. Bulson (In re Bulson),* 117 B.R. 537, 541 (9th Cir. BAP 1990), *aff'd,* 974 F.2d 1341 (9th Cir.1992). The Supreme Court has opined: " '[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore,* 270 U.S. at 610, 46 S.Ct. 367.

 In addition, the term "same aggregate set of operative facts" does not mean that there must be identical facts, "since the facts relied upon by the plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim." *Id.; Albright,* 362 F.2d at 929 ("Two bundles of facts seldom are identical for comparing 'transactions,' and so close judgments must be made from time to time.")

By comparison, some other circuit courts do not use the "logical relationship" test. They believe a narrow interpretation of the "same transaction" requirement should be used in the bankruptcy context. For example, the Third Circuit holds that "a mere logical relationship," *i.e.,* involving "the same two parties ... and a similar subject matter," "is not enough" to warrant recoupment in the bankruptcy context. *University Medical Center v. Sullivan (In re University Medical Center),* 973 F.2d 1065, 1081 (3rd Cir.1992) (withholding of Medicare payments in one year to adjust for overpayments in another year

was not the "same transaction"). It applied a "circumscribed" definition of "transaction," which requires that both claims arise out of the "identical transaction," or out of a "single integrated transaction, so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.* at 1080–81. *Accord, Malinowski v. N.Y. State Dept. of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2nd Cir. 1998) (holding that, in bankruptcy, "transaction" is given a more restricted definition than in the context of compulsory counterclaims under the rules of civil procedure). That approach has been expressly rejected by the Ninth Circuit, and we must follow the Ninth Circuit definition. *See Newbery*, 95 F.3d at 1402; *TLC Hosps.*, 224 F.3d at 1013.

Under either standard, however, courts evaluate the equities of the case, the main difference between them being the "degree of interconnectedness required with respect to the relevant obligations." 5 *Collier, supra*, ¶ 553.10[01] at 553–104.

### B. Applying the Test to the Facts

█ Briefly, the debtor's disability claim history was as follows:

1996—First Application for LTD benefits

1996–1997—Received LTD benefits from Aetna

June 1997—Received Social Security lump sum payment

Aug.1997—Debtor returned to work

Aug.1997—LTD benefits terminated

Nov.1997—Chapter 7 petition filed; 1998 discharge

Nov.1999—Second Application for LTD benefits

1999–2000—Received adjusted LTD benefits

April 2000—Debtor's medical retirement

Clearly, the second claim was made more than six months after the first claim. Even though the two disability benefit events occurred under the same Policy, there was a two-year interval between each claim, during which time the debtor left work, returned to work, and filed for bankruptcy. These facts created separate LTD benefit claim periods, according to the unambiguous Policy language, which treats multiple benefit periods as one eligibility period only if they are less than six months apart.[6] The bankruptcy court therefore concluded that these disability claims represented different transactions.

Aetna argues that the bankruptcy court misapplied the "logical relationship" standard, referring to the following comments made by the court at the January 12, 2001 hearing (emphasis supplied):

> The [recoupment] doctrine is recognized in bankruptcy in the sense that ... that which would otherwise be a non-dischargeable debt can be recouped in the sense of the non-payment of future obligations. **It's something, in my view, that is to be construed relatively narrowly in the law** because of the support that must be given to the strength of the bankruptcy discharge and its otherwise encompassing character.

*Syrovy v. Alpine Resources, Inc.*, 122 Wash.2d 544, 551 n. 7, 859 P.2d 51, 54 n. 7 (1993). *See also Ladum v. Utility Cartage, Inc.*, 68 Wash.2d 109, 116, 411 P.2d 868, 872 (1966) (A contract is ambiguous when it is "[c]apable of being understood in either of two or more possible senses".) (quoting Webster's New International Dictionary (2d ed.)).

---

**6.** In its Reply Brief, Aetna attempts to raise a factual issue regarding the true meaning of this Policy language, arguing that it was misconstrued by the bankruptcy court. Our review of the Policy reveals that the clause is unambiguous, and this tardy argument does not raise a genuine factual issue. Whether a contract is ambiguous is a question of law.

We first observe that the bankruptcy court's opinion was nothing more than an expression of the general view that the application of recoupment in bankruptcy cases must be carefully and correctly applied. *See* 5 *Collier, supra,* ¶ 553.10[3].

The Ninth Circuit has applied the "logical relationship" test in two seminal cases, *TLC Hosps.* and *Newbery*, both of which were considered by the bankruptcy court. However, the facts of these cases differ from those of the case before us.

*TLC Hosps.* concerned a recoupment claim by Medicare, a statutory health insurance program administered by the United States Department of Health and Human Services ("HHS"). The Medicare statute specifies an accelerated payment system to ensure that providers are paid promptly. Service providers, like TLC, receive periodic payments on an estimated basis prior to a fiscal year audit. At the end of the audit, a retroactive adjustment is made in order to balance the accounts.

The issue in *TLC Hosps.* was whether Medicare could recover its overpayments from one fiscal year by adjusting the interim payments for services performed in a subsequent fiscal year. The Ninth Circuit examined the statutory and regulatory framework of the Medicare program. It observed that "underpayments and overpayments are an expected and inevitable result of this payment system" and that Medicare was a "specialized and continuous system of estimated payments and subsequent adjustments." 224 F.3d at 1012. It also opined that Congress "clearly indicated that it wanted a provider's

stream of services to be considered one transaction for purposes of any claim the government would have against the provider." *Id.* at 1013 (quoting *United States v. Consumer Health Servs. of America, Inc.,* 108 F.3d 390, 395 (D.C.Cir.1997)).

The Ninth Circuit also examined the equities, and found that recoupment was equitable as applied to a bankrupt provider because the Medicare system enabled it to maintain a cash flow, even in bankruptcy. 224 F.3d at 1014.

Thus, the Ninth Circuit held that the timing of the overpayments and underpayments was not material, and that the events were "parts of the same transaction for purposes of recoupment." *Id. Contra University Medical Center,* 973 F.2d at 1081–82 (Third Circuit's holding that the *annual* audit period is the "transaction" for recoupment purposes under Medicare).

However, the Ninth Circuit expressly cautioned that, generally, in the commercial setting, the "logical relationship" concept should not be applied "so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction." *Id.* at 1012.

*TLC Hosps.* helps us to distinguish the case law involving Medicare recoupments from our facts.[7] Typically, the Medicare provider is a hospital or nursing facility which processes multiple services on a continuing basis, and the contract is between HHS and the provider. In contrast, Aetna's LTD plan is a personal contract with each employee, designed to provide direct

**7.** There are several cases holding that recoupment of prepetition Medicare or Medicaid funds is permissible. *See: In re CDM Mgmt. Servs., Inc.,* 226 B.R. 195, 197 (Bankr. S.D.Ind.1997); *In re Heffernan Mem. Hosp. Dist.,* 192 B.R. 228, 232 (Bankr.S.D.Cal. 1996); *Visiting Nurse Ass'n of Tampa Bay, Inc. v. Sullivan (In re Visiting Nurse Ass'n of* *Tampa Bay, Inc.),* 121 B.R. 114, 119 (Bankr. M.D.Fla.1990); *Mercy Hosp. of Watertown,* 171 B.R. at 495–96 (remanding for factual investigation of contracts); *Sapir v. Blue Cross/Blue Shield of Greater New York (In re Yonkers Hamilton Sanitarium Inc.),* 34 B.R. 385, 387–88 (S.D.N.Y.1983).

benefits to the employee, who is then obligated to reimburse overpayments if benefits are also received from another source. Thus, *TLC Hosps.* does not control this case.

■■■■ Although an express contract is not necessary for the application of recoupment, courts often find that the "same transaction" requirement is satisfied when corresponding liabilities arise under a single contract. 5 *Collier, supra,* ¶ 553.10[1] at 553–102. Because our case involves a single contract—the Policy, Aetna argues that the debtor should not receive the benefits of the Policy without the burdens of repayment. The rationale for allowing recoupment in contract cases is that it would be inequitable for the debtor to enjoy the benefits of a transaction without also meeting his obligations. *Newbery,* 95 F.3d at 1403 (adopting the reasoning, but not the standard, of *University Medical Center,* 973 F.2d at 1081); *cf. Lee,* 739 F.2d at 875–76 (holding that Social Security benefits were "entitlements" rather than contractual rights, and denying recoupment against postpetition benefits).

■■■■ Commercial contracts are appropriate for recoupment when there are ongoing transactions and obligations arising under the same contract. *See Ashland Petrol. Co. v. Appel (In re B & L Oil Co.),* 782 F.2d 155 (10th Cir.1986) (month-to-month purchases of oil under a single contract arose from same transaction for recoupment purposes); *Newbery,* 95 F.3d at 1401–02.

*Newbery,* the other significant Ninth Circuit case, involved several contracts, one with a third party, which revolved around indemnification rights and rental obligations relating to use of construction equipment. Since all of the agreements were considered to be one contract under state law, the Ninth Circuit Court of Appeals determined they were "one transac-

tion" for recoupment purposes. The court clarified the equitable nature of recoupment in the commercial setting, keeping in mind that "[r]ecoupment permits a determination of the just and proper liability on the main issue...." *Id.* at 1400 (quoting *Cooper,* 507 U.S. at 265 n. 2, 113 S.Ct. 1213).

> [R]ecoupment is an equitable doctrine which is based on the premise that "the defendant should be entitled to show that because of matters arising out of the transaction sued on, he or she is not liable in full for the plaintiff's claim."

*Newbery,* 95 F.3d at 1401 (citations omitted).

The court concluded that the intertwining of mutual obligations between the debtor and the creditor meant recoupment must be allowed in order to "arrive at a just determination of the proper amount of [the] plaintiff's claim." 95 F.3d at 1403. Factually convoluted, however, *Newbery* has little similarity to our case.

More on point is *Cal. Canners and Growers v. Military Distributors of Va., Inc. (In re Cal. Canners and Growers),* 62 B.R. 18 (9th Cir. BAP 1986), a pre-*Newbery* case that is still good law. There, we held that each delivery under a single distributor's agreement was a separate transaction for recoupment purposes. We found significant the fact that the creditor's claim, based on prepetition transactions, and the debtor's claim, based on the creditor's nonpayment of the postpetition invoices, involved the purchase and sale of *different* goods. 62 B.R. at 20.

Also of interest is *Malinowski,* a case from the Second Circuit. 156 F.3d 131. There, in 1994, a worker had collected state unemployment benefits based on his initial application, but was subsequently determined to be ineligible. He reapplied in 1996, was determined to be eligible, and

the state then withheld fifty percent of his weekly benefits in order to recover the overpayments made in 1994. In the interim between the two benefit periods, the worker filed for bankruptcy. Both the bankruptcy court and district court held that the state was entitled to recoup the benefits. 156 F.3d at 132–33.

The Second Circuit then reversed on the basis of the same narrow standard articulated in *University Medical Center, i.e.,* that the circumstances giving rise to the creditor's claim, and those giving rise to the creditor's obligation, must result from "a set of reciprocal contractual obligations or from the same set of facts," in order to be part of the same transaction. 156 F.3d at 134. It held that the two unemployment benefit claims "arose from different sets of facts, each complete in itself." *Id.*

The Second Circuit also applied the contractual relation theory to the facts, but rejected it because there was no single, overarching contract involved. *Id.* at 134–35. Interestingly, the court opined that, even if the unemployment benefits were considered to be part of a "lifetime government insurance scheme," each claim represented separate unemployment periods of eligibility, and thus "[w]here the contract itself contemplates the business to be transacted as discrete and independent units, even claims predicated on a single contract will be ineligible for recoupment." *Id.* at 135 (citing *Cal. Canners and Growers* ). *See also Am. Central Airlines, Inc. v. Dept. of Transp. (In re Am. Central Airlines, Inc.),* 60 B.R. 587, 592 (Bankr. N.D.Iowa 1986) (where the debtor airline participated in a federal subsidy program to provide regular air service to several destinations, the Department's withholding of monthly subsidies to the debtor for overpayments involving multiple flights was permissible recoupment).

Here there was a contract between the debtor and Aetna, and there were two distinct disability claims. Aetna's liability for the benefits under the second claim can logically be severed from the first disability claim. The Policy anticipated that one employee could have multiple disability claims, and it provided for this event by unambiguously defining "one period of total disability" as "[a]ny two separate periods of total disability which arise from the same or related causes and which are separated by less than six months of active work." Thus, under the Policy, the debtor's first and second disability periods were not "one period" of disability, but were administered separately. Because Aetna required a Reimbursement Agreement for each claim, the separate disability periods were memorialized in separate contractual agreements. Therefore, the documents established that these were separate transactions, with a different set of rights and obligations per eligibility period. As such, this case resembles *Cal. Canners and Growers* more than *TLC Hosps.* or *Newbery.*

Aetna argues that the specific Policy provision does not override the broad Policy language providing that Aetna has the right to recover excess payments, without conditioning or limiting such right. This argument is not persuasive. Under Washington law, the specific language of the contract controls over the more general language. *Wash. Pub. Power Supply Sys. v. Pittsburgh–Des Moines Corp.,* 876 F.2d 690, 702 (9th Cir.1989) (citing *Wash. Local Lodge No. 104 v. Int'l Bhd. of Boilermakers,* 28 Wash.2d 536, 541, 183 P.2d 504, 507 (1947) (citing Restatement of Contracts § 236)).

Moreover, the nature of disability insurance is that it indemnifies an insured for losses caused by illness by providing monthly benefits. *See generally* 1 Mark S.

Rhodes, *Couch on Insurance* § 1:60 (2d. ed. rev.1984). Even though the debtor was continually covered for the risk of loss by an overarching Policy, the "benefit" that he received under the Policy was financial.

The equities also favor the debtor's position. His benefits were terminated when he re-entered the workforce. In effect, the debtor was determined to be *not* disabled from 1997 to 1999, and his benefits ceased during that time. Congruently, the debtor's obligation in connection with the first claim for benefits was the reimbursement of any overpayments of those discrete benefits, rather than the reimbursement of future benefits for which he might qualify, months or years later. Likewise, Aetna's obligation to pay benefits for the second claim was unrelated to the first claim. Unlike *Newbery*, the operative facts for the first disability claim were separate and distinct from those for the second claim, and would be so, even if both claims were for the same type of recurring illness.

There is some case law from other circuits involving employee disability plans, but these cases are factually distinguishable. Most often, they involve a single claim under a single contract, and payments which cross over the bankruptcy filing.

For example, in *Hiler, supra,* an employee became "totally disabled" and received estimated disability benefits from an employee Plan. At the employee's request, the automatic deduction for anticipated benefits was stopped with the understanding that he would repay any resulting overpayment. However, the employee failed to notify the Plan after he was also approved for Social Security benefits, which resulted in an overpayment. The Plan began to deduct the overpayment balance out of his monthly benefits, and the employee sought relief in bankruptcy. The bankruptcy court held that the Plan could recoup the overpayments because they stemmed from the same transaction and contract, *i.e.*, the Plan, under which the debtor had asserted a disability claim. *Hiler*, 99 B.R. at 242. *See also Madden*, 914 F.2d at 1287 (holding that in ERISA actions[8] courts uphold "the recovery of retroactive social security awards by ERISA plans where such plans provide for the reduction of benefits by such awards, even when the Plan does not specifically provide for such retroactive reimbursement.")

In *Aetna Life Ins. Co. v. Bram (In re Bram)*, 179 B.R. 824 (Bankr.E.D.Tex. 1995), the debtor applied for LTD benefits, under an Aetna insurance plan, also executing a "Reimbursement Agreement." After paying benefits, Aetna discovered that the debtor had also been approved for and had received Social Security benefits. It suspended the LTD payments, and the debtor filed a chapter 7 bankruptcy petition. The bankruptcy court ruled in favor of Aetna, holding that, under the plan and the reimbursement agreement, the contractual benefits and burdens were part of a single transaction. *Id.* at 827. *Accord In re Graves*, 234 B.R. 149, 150 (Bankr.

---

**8.** ERISA is the federal "Employee Retirement Income Security Act of 1974." Compare another ERISA disability insurance nonbankruptcy case, where the district court held that, even though an employee was overpaid long-term disability benefits for one injury, and then had his benefits for a subsequent injury reduced to recover those overpayments, the plan policy clearly did not limit the recovery rights to benefits for the same disability. *Elliott v. Lockheed Martin Energy Sys., Inc.*, 61 F.Supp.2d 745, 750 (E.D.Tenn.1999). However, the court applied the "arbitrary or capricious" standard of review to the ERISA plan administrator's decisions. *Id.* at 748.

M.D.Fla.1999) (to disallow deduction of prepetition overpayments from postpetition amounts owed on the same policy would amount to an unjustified windfall); *Aetna Life & Cas. Co. v. LaPierre (In re LaPierre)*, 180 B.R. 95, 100 (Bankr.D.S.C. 1994) (single disability claim under similar policy).

Closely related is *Harmon*. There, two types of worker's compensation benefits were approved prepetition for one employee: income for time-loss and income for permanent disability. The state provider then sought to recoup the prepetition temporary disability overpayments from the employee's postpetition permanent disability payments. We held that "logic requires the conclusion that both claims flow from the same prepetition injury." 188 B.R. at 425. We concluded that the overpayments constituted a pre-existing charge against the debtor's right to permanent disability benefits—both rights arising prepetition, so that either recoupment or setoff was available. *Id.* at 425–26; *See also Continental Cas. Co. v. Gullett*, 253 B.R. 796 (S.D.Tex.1999), *aff'd*, 220 F.3d 585 (5th Cir.2000) (worker's compensation case allowing recoupment involving single compensation claim but different benefit types).

A line of Veterans Administration ("VA") cases also allow recoupment where a debtor received a lump sum military severance pay based on a disability, then was later rated by the VA for benefits for the same disability. Those cases also involve federal statutes allowing the VA to recoup several payments to prevent double compensation for the same disability. *See United States v. Keisler (In re Keisler)*, 176 B.R. 605, 607 (Bankr.M.D.Fla.1994) and *Newman v. Veterans Admin. (In re Newman)*, 35 B.R. 97, 98–99 (Bankr. W.D.N.Y.1983).

These cases are well-reasoned. Typically, as in our case, there was a single overarching policy. The similarity ends there, however. Our case does not concern a federal government creditor whose public policy concerns compete with the Bankruptcy Code's fresh start policy. Here, there were *two* Reimbursement Agreements, *two* disability periods, and *two* claims separated by a two-year period of employment and a bankruptcy. Therefore, the bankruptcy court properly applied the "logical relationship" test to deny recoupment.

### CONCLUSION

Aetna's claim for overpayments of LTD benefits that were recoverable under the Policy and the debtor's right to postpetition benefits for a separate disability claim did not arise from the same transaction and were not logically related. Thus, recoupment was not available to Aetna. The prepetition claim was discharged by the debtor's intervening bankruptcy, and Aetna violated the discharge injunction by deducting the balance of the overpayments from the debtor's benefits. Therefore, the bankruptcy court's judgment awarding relief to the debtor is **AFFIRMED.**