**In re AUREAL, INC., etc., Debtor.**

**Aureal, Inc., etc., Plaintiff,**

**v.**

**I/O Magic Corporation, etc., Defendant.**

**Bankruptcy No. 00–42104 T.**
**Adversary No. 01–4256 AT.**

United States Bankruptcy Court,
N.D. California.

May 22, 2002.

Sidney P. Levinson, Joshua M. Mester, Hennigan, Bennett and Dorman, Los Angeles, CA, for debtor.

Lawrence M. Cron, Senn, Palumbo and Meulemans, Irvine, CA, for defendant.

Minnie Loo, Office of the U.S. Trustee, Oakland, CA, for U.S. Trustee.

### MEMORANDUM OF DECISION

LESLIE J. TCHAIKOVSKY,
Bankruptcy Judge.

Plaintiff Aureal, Inc. ("Aureal"), the above-captioned chapter 11 debtor, moves

for summary judgment in the above-captioned adversary proceeding. Defendant I/O Magic Corporation ("Magic") seeks leave to amend its answer (the "Answer") to add an affirmative defense of recoupment. For the reasons stated below, the Court grants Magic's motion to amend the Answer and grants in part and denies in party Aureal's motion for summary judgment.

## SUMMARY OF FACTS

Prior to the commencement of this chapter 11 case, Aureal sold digital audio imaging products. Magic was its exclusive North American distributor except that Aureal retained the right to sell products to certain other vendors. Aureal' s and Magic's business relationship was governed by a written distribution agreement (the "Agreement"). On April 5, 2002, Aureal filed a bankruptcy petition, commencing this chapter 11 case. Shortly thereafter, Aureal ceased operating and sold substantially all of its assets. The Agreement terminated on or about February 4, 2001.

On July 31, 2001, Aureal filed a complaint against Magic, seeking payment of $540,700, plus interest, for products received for which Magic had not paid. On August 31, 2001, Magic filed the Answer. In the Answer, Magic admitted that Aureal had invoiced it for $540,700 but otherwise denied liability for the debt. Magic asserted sixteen affirmative defenses, including, as its fourth affirmative defense, the right to a setoff. It did not assert a recoupment defense.

On or about September 26, 2001, approximately one year after the bar date for filing claims and approximately two months after confirmation of Aureal's reorganization plan, Magic filed a proof of claim (the "Proof of Claim"), asserting a damage claim of approximately amount of $1.5 million. On November 30, 2001, Aureal filed an objection to Magic's claim on the ground that the Proof of Claim had been filed after the bar date and that Magic' s failure to file the Proof of Claim on a timely basis was not the result of excusable neglect. On or about February 21, 2002, the Court sustained Aureal's objection and disallowed the Proof of Claim as untimely, without reaching the merits of Magic's claim.

On March 18, 2002, Magic filed a motion to amend the Answer to add a recoupment defense. On April 11, 2002, the Committee and Aureal filed a joint motion for summary judgment. Both motions were heard on May 9, 2002 and taken under submission. The issues presented and the Court's rulings with respect to them are set forth below.

## DISCUSSION

### A. MOTION TO AMEND

■ Magic's motion to amend the Answer to assert a recoupment defense is made pursuant to Fed.R.Bankr.P. 7015 (incorporating by reference Fed.R.Civ.P. 15(a)). Rule 15(a) of the Federal Rules of Civil Procedure provides that, under these circumstances, a party may only amend its pleading "by leave of court or by written consent of the adverse party." However, "leave shall be freely given when justice so requires." Case law directs the Court to consider four elements in determining whether to grant a motion to amend: (1) whether the party has unduly delayed in bringing the motion, (2) whether the party is acting in bad faith, (3) whether the amendment would be futile, and (4) whether permitting the amendment would prejudice the adverse party. *In re Rogstad,* 126 F.3d 1224, 1228 (9th Cir.1997).

■ Magic contends that justice requires that it be permitted to amend the

Answer to add a recoupment defense. Because recoupment is virtually identical to setoff, the addition of a recoupment defense would not significantly alter Magic's previously asserted legal theories. Moreover, Aureal has conducted no discovery to date, and no trial date has been set. Therefore, permitting the amendment will not prejudice Aureal. Magic also contends that it is requesting leave to amend the Answer in good faith and has not unduly delayed in making the request.

In opposing the motion, Aureal notes that amendments are disfavored when the facts and legal theories were known to the party seeking the amendment from the inception of the litigation, citing *Gordon v. North American Co. for Life and Health,* 2000 WL 1427343, *5 (S.D.Cal.). Since setoff and recoupment are virtually identical defenses, nothing prevented Magic from asserting a recoupment defense at the onset. On the other hand, although the defenses are virtually identical, they are also distinct. Aureal contends that it should not be required to guess what defenses Magic will assert. Aureal does not contend that Magic has acted in bad faith and cites no specific prejudice other than delay that it would suffer if the amendment is permitted.

Aureal also contends that the motion should be denied because the amendment would be futile. It contends that its summary judgment motion establishes that Magic' s recoupment claim has no merit as a matter of law. Courts in the Ninth Circuit have regularly refused to permit parties to amend pleadings to assert claims or defense that would be defeated on summary judgment. *See Gabrielson v. Montgomery Ward & Co.,* 785 F.2d 762, 766 (9th Cir.1986); *Campbell v. U.S. Air Force,* 755 F.Supp. 897, 899 (E.D.Cal. 1990).

The Court concludes that, given the absence of evidence of bad faith, undue delay, or specific prejudice, the question of whether the motion to amend should be granted turns on the element of futility. Whether it would be futile for Magic to amend the Answer to add a recoupment defense turns on the outcome of Aureal's motion for summary judgment. As discussed below, the Court concludes that Aureal's motion for summary judgment must be denied in part at this time. Therefore, the Court also concludes that it would not be futile for Magic to amend the Answer, and the motion to amend will be granted.

## B. MOTION FOR SUMMARY JUDGMENT

There is no dispute concerning the standards applicable to summary judgment motions. With limited exceptions, a court is required to grant summary judgment, or partial summary judgment, when requested to do so by a party in interest and when the court concludes that there is no genuine issue as to a material fact. Fed. R.Bankr.P. 7056 (incorporating by reference Fed.R.Civ.P. 56(c)). The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has done so, the burden shifts to the party opposing the motion to set forth specific facts showing the existence of a genuine issue of material fact. Fed.R.Bankr.P. 7056 (incorporating by reference Fed.R.Civ.P. 56(c)). All doubts concerning the existence of a genuine factual issue must be resolved in favor of the party opposing the motion for summary judgment. *British Airways Board v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978).

When the dispute presented turns on the construction of contractual terms, summary judgment is appropriate if the contract terms are clear and unambiguous even if the parties disagree about their meaning. *Kassbaum v. Steppenwolf Productions, Inc.*, 236 F.3d 487, 491 (9th Cir. 2000).

There are five distinct issues presented by Aureal's motion for summary judgment as follows:

(1) Whether Magic owes Aureal $540,000 plus interest for products purchased pursuant to the Agreement;

(2) Whether Magic is prohibited from asserting a setoff defense because the Proof of Claim was disallowed;

(3) Whether Magic's right to return products pursuant to paragraph 7.3 of the Agreement survived termination of the Agreement;

(4) Whether there is a genuine factual issue with respect to whether Aureal has breached its obligation to provide Magic with "price protection" pursuant to paragraph 5.3 of the Agreement; and

(5) Whether Magic's waiver of damages pursuant to paragraph 11 of the Agreement bars its recoupment defense.

The Court will address each of these issues below.

## 1. Magic's Indebtedness to Aureal for Products Purchased

In its opening brief, Aureal met its initial burden of establishing that Magic owes it $540,000 plus interest for products purchased under the Agreement. Paragraph 5.3 of the Agreement requires Magic to pay for products received within 45 days after receipt. Paragraph 1.4 defines "products." Aureal's brief lists the nine invoices upon which its claim is based, specifying as to each invoice the date payment was due, the product type, the number of units, the price per unit, and the outstanding amount. The total of the outstanding amounts equals $540,700. As evidentiary support for its claim, Aureal submits the Declaration of Gerrie Sargent (the "Sargent Declaration"), Aureal's Senior Accounting Manager.

In its opposition brief, Magic does not dispute the authenticity or accuracy of the nine invoices identified in Aureal's opening brief and in the Sargent Declaration. However, it contends that these nine invoices do not tell the whole story. In the Declaration of Bijan Diba (the "Diba Declaration"), Magic's Accounts Manager, filed in support of its opposition, Magic cites a number of transactions that it contends must be taken into account in determining whether Magic owes anything to Aureal.

First, Diba declares, the products identified in three of the invoices were returned: i.e., Invoice Nos. 3314, 3324, and 3341, for a total of $244,000. Second, he declares, Aureal issued two credit memos that have not been applied (for unspecified amounts) on February 25, 2000, based on Magic's right to "price protection" and in reimbursement of Magic's marketing expenses.[1]

In its reply, Aureal contends that the Diba Declaration is insufficiently specific to create a genuine issue of fact as to any of these purported transactions. It ob-

---

1. Diba also declares that Aureal owes Magic $49,814 for sound cards Magic sold to Aureal and that Magic is entitled to: (1) a credit of $442,968.17 for products returned to Magic by its customers which Magic claims the right to return to Aureal for credit and (2) $364,728 in additional "price protection" credits based on reductions that Magic contends it was compelled to give to its customers. The Court does not view these contentions (and the evidence supporting them) as part of the adjudication of Aureal's claim against Magic. It views them as part of Magic's defenses of setoff and recoupment. Consequently, they will be discussed in the context of those defenses rather than here.

jects to and moves to strike most of the Diba Declaration as lacking foundation re personal knowledge, violating the best evidence rule, and containing conclusory statements, improper opinions, and speculation.

With respect to Magic's contention that it has returned the products covered by Invoice Nos. 3314, 3324, and 3341 and thus is entitled to a credit for the amounts of those invoices, Aureal contends that Magic's assertion that the products were returned is conclusory and thus insufficient to put the factual matter at issue. It contends that, if this occurred, Magic should have received some documentation of the event. It notes that none has been provided in support of Magic's opposition.

Aureal admits that two credit memos were issued on February 25, 2000 but denies that the credits have not been applied in calculating the $540,000 claim. In support of this contention, Aureal provides the supplemental declaration of Gerrie Sargent (the "Supplemental Sargent Declaration"). The Supplemental Sargent Declaration states that these credits have been applied. A copy of an account ledger is attached, showing the application of the credits.

In response to Aureal's reply, without leave of Court, Magic filed the supplemental declaration of Bijan Diba (the "Supplemental Diba Declaration").[2] In the Supplemental Diba Declaration, Diba identifies and attaches a series of exhibits. First, he identifies and attaches as Exhibit 1 copies of Invoice Nos. 3331 (which Diba states was mistakenly identified in Magic's opposition papers as Invoice No. 3341) and 3324. As Exhibits 2 and 3, respectively, he identifies and attaches: (1) copies of two Aureal RMA Request Forms dated

March 15, 2000, requesting the right to return the products covered by Invoice Nos. 3331 and 3324 and (2) a copy of a bill of lading dated March 20, 2000, documenting the return of the products in question. Second, Diba identifies and attaches as Exhibit 4 a copy of Invoice No. 3314 and as Exhibit 5 a copy of a bill of lading, documenting the return of the product covered by Invoice No. 3314. Diba declares that Magic has thus established the right to additional unapplied credits totaling $244,000.

The Court is persuaded that the evidence presented by Magic in the Supplemental Diba Declaration is sufficient to create a genuine issue of material fact with respect to whether Magic owes Aureal the amounts set forth in Invoice Nos. 3314, 3324, and 3331. The evidence presented with respect to the purported return of the products covered by Invoice No. 3314, taken alone, would be insufficient to create a genuine issue of fact. The bill of lading purportedly documenting the return of product does not contain any reference that the Court can identify tying it back to the invoice. However, the timing of the bill of lading is consistent with Magic's contentions. Given the stronger evidence provided with respect to the other two invoices, the Court is unwilling to deprive Magic of the opportunity of proving that it also returned the product covered by Invoice No. 3314. The Court will summarily adjudicate Aureal's claim against Magic for the amounts set forth in the remaining six invoices, plus interest thereon.

### 2. Magic's Right to Assert a Setoff Based on a Disallowed Claim

 As noted above, Magic asserted the defense of setoff in the Answer. Aureal

2. At the hearing on the motion, Aureal requested that the Supplemental Diba Declaration be stricken. In the interests of justice, the Court will deny this request. However, it

will consider Aureal's request for sanctions, if promptly filed, to compensate it for any additional costs incurred as a result of the late filing.

contends that, because the Proof of Claim was disallowed, this defense should be denied as a matter of law. Section 553(a)(1) of the Bankruptcy Code provides that the Code does not affect a creditor's right to offset a mutual pre-petition debt owing by such creditor to the debtor that arose before the commencement of the bankruptcy case against a pre-petition claim of such creditor against the debtor "except to the extent that ... the claim of such creditor against the debtor is disallowed...." 11 U.S.C. § 553(a)(1).

Magic contends that § 553(a)(1) should be read to preclude the use for setoff purposes of a claim that has been disallowed on the merits, not to preclude the use of a claim that was disallowed only because the proof of claim was not filed on a timely basis. Magic notes that courts have routinely permitted claims to be asserted for setoff purposes even though no proof of claim was filed at all. *See In re Davidovich*, 901 F.2d 1533 (10th Cir.1990); *In re G.S. Omni Corp.*, 835 F.2d 1317, 1317–1319 (10th Cir.1987). It would make no sense, Magic contends, to permit a claim to be set off when no proof of claim was filed but to prohibit its use for this purpose when a proof of claim was filed late.

As Aureal notes, the cases cited by Magic do not support its position. In *G.S. Omni*, the court stated that, as a general rule, it was not necessary to file a proof of claim to assert the claim for setoff purposes. However, it noted as exceptions to this general rule claims that had been discharged or disallowed. *Id.* at 1317–1319. In *Davidovich*, the same court clarified this statement by indicating that even a discharged claim could be used for setoff purposes. However, it did not alter its view concerning the prohibition on the use of a disallowed claim for setoff purposes. *Id.* at 1539.

The only case on point that the Court has been able to locate is *In re ABCO Industries, Inc.*, 270 B.R. 58 (Bankr. N.D.Tex.2001). In *ABCO Industries*, the creditor's claim had been disallowed by default when it failed to respond to the debtor's objection. *Id.* at 61. Nevertheless, the creditor attempted to assert its claim on both setoff and recoupment theories. The *ABCO* court distinguished between those portions of the creditor's claim that could be asserted by way of recoupment and those that could only be asserted as a setoff. It permitted the creditor to use those portions of its claim that could be asserted in recoupment but prohibited the creditor's use of those portions that could only be set off. *Id.* at 61–63. The *ABCO* court relied on the plain language of § 553(a)(1) and on a summary of its substance contained in a leading bankruptcy treatise. *See* 5 Collier on Bankruptcy ¶ 553.07[1] (15th ed. rev. June 2000).

Magic's position makes more sense as an equitable matter. If a creditor may assert a right of setoff without even filing a proof of claim or when the claim has been discharged, it is difficult to see why a creditor should be precluded from asserting a right of setoff with respect to a claim that was disallowed only because the proof of claim was untimely filed. Moreover, the failure to limit this exception to a claim that has been disallowed on its merits may be explained by the fact that, until 1994, untimeliness was not a ground for disallowance of a proof of claim. *See* Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106, effective Oct. 22, 1994, adding 11 U.S.C. § 502(b)(9).

■ However, sensible or not, where the language of a statute is clear, the Court is not free to apply it other than according to its terms. *See Patterson v. Shumate*, 504 U.S. 753, 758, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *United*

*States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 249, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Because the Court concludes that the language of 11 U.S.C. § 553(a)(1) is clear and does not limit its application to claims that have been disallowed on the merits, the Court concludes that Magic is not entitled to assert a defense of setoff to reduce its indebtedness to Aureal.[3]

### 3. Did Magic's Right of Return Survive Termination of the Agreement?

█ Paragraph 7.3 of the Agreement provides that:

> 7.3 *Returns*. AURL agrees to provide IOMC and its sublicensees with return privileges identical to that offered to IOMC's retail customers for all products. IOMC and AURL shall review on a weekly basis accounts which may require return privileges.

The parties appear to agree that paragraph 7.3 provided Magic with a right to return products purchased from Aureal for a full credit against the purchase price. However, Aureal contends that Magic's right of return pursuant to paragraph 7.3 ended when the Agreement terminated. In support of this contention, Aureal relies on paragraph 12.4 which provides as follows:

> The following sections of this Agreement will survive any termination of this Agreement: 5 ("Payment Terms"), 8 ("Propriety Rights"), 9 ("Confidentiality"), 10 ("Indemnification"), 11 ("Consequential Damages Waiver"), 12 ("Term

and Termination") and 13 ("General Provisions").

Because paragraph 12.4 contains no reference to paragraph 7.3, Aureal contends that the right of return did not survive termination of the Agreement.

Magic disagrees. It contends that the list of sections that survive termination of the Agreement, as set forth in paragraph 12.4, is not exhaustive. It notes that paragraph 12.4 does not state that only these sections survive termination of the Agreement. It contends that paragraph 12.4 simply emphasizes that the sections specified therein survive. At a minimum, Magic contends, paragraph 12.4 is ambiguous, and the Court should hear evidence concerning its meaning.

The Court is persuaded that the language of paragraph 12.4 is unambiguous and that only those sections specified therein survive termination of the Agreement. Any other construction of the paragraph would be strained. Moreover, no evidence has been offered of a contrary intent. Therefore, the Court concludes that Magic is not entitled to return products purchased from Aureal at this time or to recoup against its indebtedness to Aureal an amount equal to their purchase price.

### 4. Is There a Genuine Factual Issue Regarding Aureal's Alleged Breach of Its "Price Protection" Obligations?

█ Paragraph 5.4 of the Agreement provides as follows:

---

**3.** This conclusion only affects Magic's right to reduce its liability to Aureal by its claim for a $49,814 account receivable. This account receivable does not appear to arise from the Agreement. This would not prevent Magic's use of the account receivable as a setoff since a claim may be used for setoff purposes regardless of whether it arises from the same transaction as the claim against which it is to

be set off. By contrast, a claim may only be used for recoupment purposes if it does arise from the same transaction as the claim against which it is to be recouped. *In re Madigan*, 270 B.R. 749, 754 (9th Cir. BAP 2001). Since Magic's other claims do appear to arise from the Agreement, although they may not be set off against Magic's liability to Aureal, they may be recouped.

AURL will provide price protection for Products that reside in IOMC's inventory and in the Retail Channel. Price protection will be calculated based on the pricing model described in *Exhibit C.* The new price adjustment will apply to all inventory on hand, in the retail channel, in route to and from IOMC and its sublicensees. AURL at its sole discretion will decide when to affect price decreases on the Products AURL will in "good faith" [sic] take the necessary actions to keep its product relatively competitive and adjust pricing in order to keep sales throughout the Retail Channel reasonably constant.

Exhibit C to the Agreement provides "pricing models" for Aureal-branded and Magic-branded products: e.g. Aureal will sell Magic-branded products to Magic at approximately 40% of the suggested shelf selling price point and will sell Aureal-branded products to Magic at approximately 42% of the suggested shelf selling price point.[4]

In its opening brief, Aureal contends that Magic has no claim under paragraph 5.4 upon which to base a recoupment defense. Aureal notes that paragraph 5.4 gives it the sole discretion to decide when to affect price decreases. Although paragraph 5.4 requires it to act in good faith in connection with pricing, there is no evidence that it has acted in bad faith in connection with pricing.

In its opposition, Magic contends that Aureal sold a large volume of sound cards to a broker at a substantial discount. The sound cards were similar to those previously sold to Magic by Aureal, large numbers of which were still held in Magic's inventory. Magic's customers informed Magic that they could purchase the sound cards much cheaper from other sources. Consequently, Magic was forced to lower its prices to make any sales. Magic asked Aureal to give it a credit equal to the amount of these price reductions, but Aureal has refused to do so.

In its reply, Aureal contends that paragraph 5.4 does not give Magic the right to decrease its prices to its customers and demand a comparable reduction in its indebtedness to Aureal. Moreover, it contends that Magic has not provided competent evidence of the facts upon which this portion of its claim is based.

In support of the contentions in its opposition brief, Magic filed the declaration of Ross Minion (the "Minion Declaration"), Magic's Channel Marketing Manager, and the Diba Declaration. In response to Aureal's challenge to the legal sufficiency of those declarations, Magic filed, without leave of court, the supplemental declaration by Ross Minion (the "Supplemental Minion Declaration"). The Supplemental Minion Declaration attempts to lay a better foundation for Minion's personal knowledge concerning the statements made in the Minion Declaration. However, it does not correct the declaration's hearsay problem. Aureal asks the Court to strike the Supplemental Minion Declaration as an improperly filed surreply.

Notwithstanding the insufficiency of Magic's evidence, the Court denies Aureal's request for summary adjudication of this issue.[5] The parties obviously disagree

---

4. Aureal does not contend that Magic's right to "price protection" ended when the Agreement terminated. Section 5 is one of the sections of the Agreement specified by paragraph 12.4 as surviving termination.

5. The references to statements made by Roger Goh contained in paragraph 9 may fall within an exception to the hearsay rule for party admissions. However, the references in paragraph 10 to statements made to Magic by its retailers and in paragraph 12 to statements

about what obligations paragraph 5.4 imposes on Aureal and what rights it gives Magic. It is fairly clear what Magic thinks those rights and obligations are. The Court is uncertain what Aureal thinks they are. The language itself is ambiguous. The Court concludes that parol evidence will be required to resolve this dispute.

In its opposition, Magic contends that the motion for summary judgment was premature because it had not had adequate time to conduct discovery. Aureal replies that Magic has failed to establish what discovery it wishes to conduct. Given the Court's inability to resolve this issue without further evidence, the Court agrees that, with respect to this issue, the motion is premature and that some discovery may need to be conducted.

### 5. Damages Limitation

■ Finally, Aureal contends that, regardless of Magic's rights under paragraph 5.4 of the Agreement, Magic may not recoup a damage claim against its indebtedness to Aureal because, in paragraph 11 of the Agreement, Magic waived any such claim. Paragraph 11 states as follows:

> 11. *Consequential Damages Waiver.* EXCEPT IN THE CASE OF A BREACH OF SECTION 9[6], NEITHER PARTY WILL BE LIABLE FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS, OR ANY SPECIAL, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING LOST PROFITS) REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Aureal contends that, in a commercial context, such provisions are presumed to be enforceable. *See* Cal. Comm.Code § 2719(3) (West 2002); *see also Softa Group, Inc. v. Masco Business Systems, Inc.*, 1991 WL 249725, *5–*6 (N.D.Ill.); *Cognitest Corp. v. The Riverside Publishing Co.*, 1994 WL 727980 (N.D.Ill.). Moreover, it contends that Magic's sole remedy under the Agreement was its right to return the products purchased for credit. However, as discussed above, this remedy was not available after the Agreement terminated.

Section 2719(3) of the California Commercial Code provides, in pertinent part, that:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. . . . Limitation of consequential damages where the loss is commercial is valid unless it is proved that the limitation is unconscionable.

Cal. Comm.Code. § 2719(3). In *Cognitest,* the court dismissed claims based on breach of a software distribution agreement where the agreement contained a provision waiving the right to recover "lost profits, consequential damages, and incidental damages," and no other sorts of damages were alleged in the complaint. *Id.* at *4.

---

made to Magic's retailers by Evertek appear to be inadmissible hearsay. Although the Supplemental Minion Declaration lays a better foundation for Minion's personal knowledge of the contents of the declaration, it does not correct the hearsay problem. To the extent the truth of the matters asserted by way of hearsay are important, Magic should have provided the declarations or deposition testimony of the relevant personnel from its retailers and/or from Evertek.

6. Section 9 of the Agreement imposes certain obligations of confidentiality on the parties.

In concluding that this provision was enforceable, the *Cognitest* court relied in part on *Softa Group,* an earlier decision by the same court. In *Softa Group,* the court dismissed a claim for monetary damages for breach of a software distribution agreement based on a provision waiving the right to "cover, special, indirect, incidental or consequential losses or damages (including but not limited to economic loss or loss of profits) . . . ." The *Softa Group* court concluded that the waiver was governed by § 2–719(3) of the Uniform Commercial Code. It rejected Softa's contention that the damages exclusion represented an exclusive or limited remedy and thus was governed by § 2–719(2). Section 2–719(2) of the Uniform Commercial Code (like § 2719(2) of the California Commercial Code) provides that:

> Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code.

The *Softa Group* court concluded that the Uniform Commercial Code distinguishes between a waiver of damages, on the one hand, and a limited or exclusive remedy, on the other. It concluded that the provision in the contract at issue was a waiver of damages and thus governed by § 2–719(3).

Magic advances two theories why paragraph 11 does not bar its right to recoupment. First, Magic contends that it is not asserting a *claim* for damages. It is merely attempting to reduce its own liability to Aureal. There is some case authority supporting this contention. *See In re Madigan,* 270 B.R. 749, 754 (9th Cir. BAP 2001)("The justification for the defensive use of recoupment in bankruptcy is that there is no independent basis for a 'debt,' and therefore there is no 'claim' against estate property. . . . Since recoupment is neither a claim nor a debt, it is unaffected by either the automatic stay or the debt-

or's discharge.") However, paragraph 11 does not waive only *claims* for certain types damages; it waives the parties' *liability* for those damages. Magic may not reduce its liability to Aureal by the amount of Magic's damages if Aureal has no liability for those damages.

Magic's second contention is that, even if its recoupment claim is a claim for damages, it is not a claim for consequential damages. Rather, its damages should be characterized as a claim for "general" damages. In support of this contention, Magic cites *Myers v. Stephens,* 233 Cal. App.2d 104, 120, 43 Cal.Rptr. 420 (1965). *Myers* involved a claim for damages for conversion in connection with an agreement to sell a house. The *Myers* court was required to determine whether a damage claim for lost profits constituted "special damages" and "general damages." While concluding that, in connection with a conversion claim, lost profits constituted "special damages," the *Myers* court noted that a claim for lost profits based on a breach of contract would qualify as general damages. *Id.* at 121, 43 Cal.Rptr. 420. Thus, if "special damages" are read as equivalent to "consequential damages" in the present context, *Myers* provides some support for the contention that lost profit damages do not constitute consequential damages.

However, the Court finds *Myers* of limited assistance because it was not decided under the Uniform Commercial Code, the law governing this dispute. Having reviewed the relevant provisions of that Code, the Court begins by rejecting as without merit Aureal's contention that Magic's only remedy for breach was to return the products purchased has no merit. Section 2719(1) of the California Commercial Code provides that the parties to a contract may agree to remedies in addition to or in substitute for those provided by §§ 2710 et seq. However, any such reme-

dy shall be assumed to be in addition to the remedies provided by the Code unless "it is expressly agreed to be exclusive." Nowhere in the Agreement is it expressly provided that Magic's right of return will be its exclusive remedy.

Second, the Court notes that, although the heading of paragraph 11 refers only to consequential damages, the actual waiver reaches other types of claims: e.g., incidental damages, exemplary damages, and lost profits. The California Commercial Code distinguishes between consequential damages and incidental damages. "Consequential damages" are defined in § 2715(2) as follows:

> (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and what could not reasonably be prevented by cover or otherwise; and

> (b) Injury to person or property proximately resulting from any breach of warranty.

"Incidental damages" are defined in § 2715(1) as including:

> ... expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charge, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

Moreover, §§ 2701 et seq. treat consequential and incidental damages as adjuncts to the primary remedies for breach of contract. See Cal. Comm.Code §§ 2711–2714, 2716 (West 2002) (describing buyer's remedies for a seller's breach). Although lost profits under ancillary contracts might qualify as consequential damages, lost profits from the contract between the buyer and seller appear to be covered by those primary remedies: i.e., "cover."

Finally, with all due respect to the *Softa Group* court, the Court disagrees with its application of the relevant provisions of the Uniform Commercial Code. In *Softa Group*, the damages waiver clause was even broader than paragraph 11. As noted above, it purported to waive even "cover." A buyer's right to "cover" is described as the right to purchase goods in substitution for those due from the seller and "to recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages .... less expenses saved in consequence of the seller's breach." Cal. Comm.Code § 2712(1), (2). When it concluded that § 2719(3) permitted a party to enforce this damage exclusion provision at issue, the *Softa Group* court overlooked the fact that § 2719(3) only applies to "consequential damages."

The Court disagrees with the *Softa Group* court that there is a bright line distinction between a limitation of remedies and a limitation of damages. Rather, the Court believes that the bright line distinction is between consequential damages and other types of remedies. The question remains what sort of damages is Magic seeking here. Because the alleged breach in question does not fit neatly into any of the categories specified by §§ 2701 et seq., it is difficult to categorize them. Aureal does not address the question at all. Magic contends that they are not consequential damages. The Court tends to agree. What Magic is seeking seems within the spirit, although not within the letter, of "cover." Given this conclusion, while making no final ruling on the issue at this time, the Court must deny Aureal's request for summary judgment.

## CONCLUSION

Magic's motion to amend the Answer to assert the affirmative defense of recoup-

ment will be granted. The amendment should be filed within 10 days of the entry of the order pursuant to this memorandum. Aureal's motion for summary judgment is granted in part and denied in part as follows:

1. The Court concludes that there is a genuine issue of fact with respect to the amounts purportedly due for Invoice Nos. 3314, 3324, and 3341 and denies Aureal's motion for summary adjudication of this portion of its claim. Aureal is summarily adjudicated to have a claim against Magic in the amount of the six undisputed invoices plus interest thereon.

2. The Court concludes that the disallowance of the Proof of Claim prevents Magic from asserting an affirmative defense of setoff. Consequently, the Court concludes that Magic may not set off against any amount due to Aureal its claim for an account receivable in the amount of $49,814.

3. The Court concludes that Magic's right of return, as provided by paragraph 7.3, did not survive termination of the Agreement.

4. The Court concludes that the provision obligating Aureal to give Magic "price protection" is ambiguous. Until sufficient evidence is provided to permit the Court to determine the meaning of this provision, the Court declines to rule on whether Aureal has breached it.

5. The Court denies Aureal's request that the Court grant its summary judgment on the ground that Magic waived its right to recover and/or recoup any damages in paragraph 11 of the Agreement.