**In re COAST GRAIN COMPANY, Debtor.**

**Greg Braun, Chapter 11 Plan Agent, Plaintiff,**

v.

**Bouma Dairy, B & G Hay Co., Fisher Ranch, Charlie Tadema and Bootsma Calf Ranch, Defendants.**

**Bankruptcy No. 01–19647–B–11. Adversary No. 03–1466–B.**

United States Bankruptcy Court, E.D. California, Fresno Division.

Dec. 9, 2004.

John P. Eleazarian, Fresno, CA, for Debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MOTIONS FOR SUMMARY JUDGMENT

W. RICHARD LEE, Bankruptcy Judge.

Coast Grain Company ("Coast Grain") was a merchant that sold livestock feed products on open account to customers in the agricultural livestock and dairy industries. Coast Grain's customers frequently carried large "prepaid" credit balances in their accounts. As the customers purchased feed products, the resulting charges were debited against the prepaid accounts. This adversary proceeding tests (1) whether a trustee can collect those accounts receivable, for sales made within 90 days before commencement of the bankruptcy, by avoiding the sales as preferential transfers; and (2) whether the customers with prepaid accounts are protected by the doctrines of setoff and recoupment. It is the court's conclusion that Coast Grain's accounts receivable cannot be collected through preference avoidance actions, and setoff and recoupment are not applicable to the facts of this case.

Plaintiff, Greg Braun, was formerly the chapter 11 trustee and now serves as the "Plan Agent" under Coast Grain's confirmed chapter 11 plan. The Plan Agent has all of the rights and powers of a trustee under the Bankruptcy Code, including the power to collect and liquidate Coast Grain's assets and to prosecute preference avoidance actions. Defendant Bouma Dairy ("Bouma") was a customer of Coast Grain and a participant in Coast Grain's "prepayment" program.[1] This adversary proceeding is one of dozens of "preference" actions filed by the Plan Agent that share one common element: the defendants made substantial "prepayments" to Coast Grain in anticipation of purchasing future goods and services.[2]

Bouma's motion for summary judgment, and the Plan Agent's counter-motion, are both focused on Bouma's preference defenses. They were argued on August 26, 2004. On October 20, 2004, the court heard further argument on the issue of whether goods and services purchased by Bouma, and charged against Bouma's prepaid account should actually be treated as avoidable setoffs under 11 U.S.C. § 553(b).[3] Riley C. Walter, Esq., and Justin D. Harris, Esq., of Walter Law Group and Christina R. Pfirrman, Esq., of Drummond & Associates appeared on behalf of the Plan Agent. Michael D. May, Esq., in association with Burd and Naylor, appeared on behalf of Bouma Dairy, et al.

The court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 547 and 553. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). For the reasons set forth below, Bouma's motion for summary judgment on the "ordinary course of business" and recoupment defenses will be denied. The Plan Agent's counter-motion for summary judgment will be granted in part.

### Findings of Fact

The following facts appear to be without material dispute. For more than 60 years, Coast Grain was in the business of buying, processing and selling grain and other livestock feed products to the agricultural industry. Most of Coast Grain's business involved the sale of processed feed to dairies located in Arizona, Southern and Central California.

Bouma Dairy purchased its livestock feed products from various venders, in-

---

1. "Prepayment" programs are a common practice in the dairy industry. Coast Grain aggressively marketed its prepayment program and frequently offered financial incentives in the form of additional credits (officially labeled "quality adjustments") to customers who maintained large credit balances in their accounts. Most of the customers prepaid their accounts with Coast Grain at the end of the customer's fiscal year. The Internal Revenue Service allows a cash-basis tax payor to deduct the prepaid purchase of livestock feed from current income if the transaction is properly documented and certain other conditions are met. Internal Revenue Service Ruling 79–229. In 2000/2001, Coast Grain received over $92 million of prepayments from its customers. Coast Grain did not report the "quality adjustments" as interest income, and in many cases Coast Grain issued phony "letterhead contracts" to make the prepayments appear to comply with Revenue Ruling 79–229, 1979 WL 51094. There is no evidence before the court that Bouma received any of these letterhead contracts or that Bouma took a tax deduction for any of its prepayments to Coast Grain.

2. There are approximately 94 "prepay" adversary proceedings currently pending before this court. This is one of two proceedings that are moving forward as test cases to address some of the common issues by way of summary judgment. All discovery in the remaining adversary proceedings has been stayed pending resolution of these motions.

3. Unless otherwise indicated, all statutory citations refer to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

cluding Coast Grain, on open account. Bouma had been doing business with Coast Grain for more than 50 years and had participated in Coast Grain's prepayment program for at least 15 years prior to the bankruptcy. On or about December 29, 2000, Bouma delivered a "prepayment" check to Coast Grain in the amount of $1,630,000. Coast Grain deposited the check in its general operating account and debited its cash account. Coast Grain applied $65,872.71 of the money to pay off the outstanding debit balance in Bouma's account. The remainder of Bouma's payment, $1,564,127.29 was credited to a "deferred feed sales" account. That entry resulted in a simultaneous credit to a "prepaid" account which reflected Coast Grain's liability to Bouma.

There was a general "understanding" between Coast Grain and Bouma, based on their prior business relationship, that any products or services subsequently sold to Bouma would be debited against the prepaid account. However, the terms of that understanding were nonspecific and were never reduced to writing. At the time the check was delivered, Bouma had one outstanding contract with Coast Grain, dated August 1, 2000, for the purchase of feed; $392,000 of rolled corn to be delivered between October 1, 2000 and September 30, 2001. There is no evidence in the record to show how much, if any, of this contract remained to be performed within the last 90 days before commencement of the bankruptcy. Bouma did not contract for the purchase of additional feed products in conjunction with the prepayment. Most of the dairy feed Bouma purchased from Coast Grain during 2001 was by "spot market" sale, i.e., each purchase contract was entered into at the time of the sale and delivery.

For several years prior to commencement of the bankruptcy, as an incentive to encourage participation in the prepayment program, Coast Grain also accommodated requests from its "prepay" customers to send money to the customer's third-party vendors. These third-party payments were debited against the customers' prepaid accounts as were the sales of product. Co-defendants B & G Hay Co., Fisher Ranch, Charlie Tadema and Bootsma Cattle Ranch, were third-party creditors of Bouma who received these third-party payments from Coast Grain within 90 days before commencement of the bankruptcy case.

From January to November 2001, Coast Grain sold $727,226 of products to Bouma. Within 90 days before the bankruptcy filing, Coast Grain debited $101,844.98 from Bouma's prepaid account for products sold to Bouma during the same period. From April through August 2001, Coast Grain also issued 17 third-party payments, totaling more than $900,000 to Bouma's creditors. These third-party payments were debited against Bouma's prepaid account, which reduced Coast Grain's liability to Bouma.

On or about August 25, 2001, Coast Grain gave notice to Bouma that it was terminating the prepayment program, that it would no longer debit purchases of dairy feed against Bouma's prepaid account, and that it would no longer distribute third-party payments (the "Prepay Termination"). At that time, Bouma's prepaid account had an unused credit balance of $68,693.99. Notwithstanding the Prepay Termination, Bouma continued to purchase dairy feed from Coast Grain both before and after commencement of the bankruptcy. In a declaration submitted in support of Bouma's motion, Bouma's managing partner John Schoneveld, acknowledged that these purchases were made with the intent of exercising Bouma's right of offset

against the unused prepaid account.[4] By December 1, 2001, by Mr. Schoneveld's calculation, the prepaid account had been fully offset and Bouma owed a "difference" of $3,711.28 to Coast Grain, which Mr. Schoneveld tendered with a check. Bouma did not file a proof of claim for any portion of its prepaid account.

On October 17, 2001, an involuntary chapter 11 petition was filed against Coast Grain. An order for relief was entered on November 28, 2001. Greg Braun was appointed as the chapter 11 trustee in March 2002. The Trustee's Third Amended Chapter 11 Plan was confirmed on October 28, 2003, and Greg Braun was appointed to serve as the Plan Agent.

### Issues Presented

The Plan Agent seeks to avoid and recover the sales of dairy feed and third-party payments made within 90 days before the bankruptcy, and debited against Bouma's prepaid account, as preferential transfers pursuant to §§ 547 and 550. Bouma has asserted the traditional "preference" defenses and now moves for summary adjudication of the "ordinary course of business" defense under § 547(c)(2). A significant amount of the briefing and oral argument in this adversary proceeding has been focused on the preference defenses. The threshold issue which the court must address is whether the Plan Agent can collect Coast Grain's accounts receivable as preferential transfers.

Bouma also asserts the defense of setoff and the equitable doctrine of recoupment. Bouma moves for summary adjudication of its recoupment defense. In his counter-motion, the Plan Agent asks for a ruling against Bouma on both the setoff and the recoupment defenses.

### Summary Judgment Standard

Summary judgment is appropriate, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone, although there is a genuine issue as to the amount of damages." Fed. R.Civ.P. 56(c) (made applicable in this adversary proceeding by Fed. R. Bankr.P. 7056).

A material fact is one that might affect the outcome of the suit under the governing law and irrelevant or unnecessary factual disputes will not be considered in a motion for summary judgment. *Anderson, et al. v. Liberty Lobby, Inc., et al.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of showing that there is no genuine dispute as to each issue of material fact. *Celotex Corporation v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265

---

4. Mr. Schoneveld's declaration states,
"I continued to accept feed shipments from Coast Grain after August 25, 2001 with the intent of exercising Bouma Dairy's right to offset the amount of such shipments against the unused prepayment balance. As of November 1, 2001, Bouma Diary [sic] owed Coast Grain $3,711.28 more than Coast Grain owed it and on December 6, 2001, I wrote a check to Coast Grain for that amount of money in satisfaction of the difference."

Mr. Schoneveld's declaration was not offered in relation to Bouma's setoff defense. It was offered to illustrate the history of dealing between Bouma and Coast Grain in support of the "ordinary course of business" defense. The testimony was also offered to support Bouma's contention that the prepayment, the subsequent purchases of dairy feed, and the third-party payments were intended to be a "single transaction," a necessary element of Bouma's recoupment defense. See recoupment discussion infra.

(1986). However, the party adverse to a motion for summary judgment cannot simply deny the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). More precisely, "[i]t is not enough that the nonmoving party point to disputed facts; rather, they must make a sufficient showing to establish the existence of a triable issue of material fact as to an element essential to the moving party's case." *In re Powerburst Corporation*, 154 B.R. 307, 309–310 (Bankr.E.D.Cal.1993), citing *Lake Nacimiento Ranch v. San Luis Obispo County*, 830 F.2d 977, 979–980 (9th Cir.1987), cert. denied 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988).

The parties may use summary judgment to dispose of all or any part thereof the opponents claim or cross claim. Fed. R.Civ.P. 56(a) & (b). The court may sua sponte grant summary judgment in favor of a nonmoving party as long as the moving party was provided a "full and fair opportunity to ventilate the issues in the motion." *United States v. Real Property Located at 25445 via Dona Christa, Valencia California*, 138 F.3d 403, 407, n. 4 (9th Cir.1998) citing *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir.1982). The filing of a formal cross-motion is not necessary. *Local 453, International Union of Electrical, Radio & Machine Workers, AFL–CIO v. Otis Elevator Company*, 314 F.2d 25, 27 (2d Cir.1963).

### Analysis and Conclusions of Law

### Coast Grain's Accounts Receivable Were Not Preferential Transfers Because They Are Independently Enforceable Obligations

■ The one factor which distinguishes this case from a typical preference dispute is that the traditional debtor/creditor sequence has been reversed. Bouma was a customer of Coast Grain, not a vendor.

Bouma became a creditor of Coast Grain when it prepaid a significant amount of money to its open account, far in advance of the contractual commitments for the goods and services that were subsequently debited against Bouma's account. Coast Grain deposited the prepayments into its general operating account and carried a credit account balance for Bouma on its books and records. It is undisputed that Bouma's prepaid account represented a liability for Coast Grain and a claim for Bouma. It is also undisputed that each subsequent shipment of products to Bouma generated an "account receivable" for Coast Grain and a claim against Bouma. Similarly, each third-party payment which Coast Grain issued at Bouma's request resulted in a claim for contractual or equitable reimbursement, another form of account receivable that could be enforced against Bouma.

■ The rights which Coast Grain acquired in each of these transactions are markedly different from the rights which the Plan Agent may exercise pursuant to his bankruptcy avoiding powers. For example, each of the accounts receivable is independently enforceable under California law, without regard to any statutory provisions of the Bankruptcy Code. Each of Coast Grain's accounts receivable came into existence prior to commencement of the bankruptcy case, and they became assets of the bankruptcy estate upon commencement of the case. § 541(a)(1). By contrast, a trustee's statutory avoiding powers do not come into existence until commencement of the case, and they do not generate any property for the bankruptcy estate until the trustee successfully recovers something. § 541(a)(3). A preferential transfer results in diminution of the estate to the detriment of creditors. *Hansen v. MacDonald Meat Company (In re Kemp Pacific Fisheries, Inc.)*, 16 F.3d 313,

316 (9th Cir.1994); *citing Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). A transfer which creates an equivalent account receivable, or other form of contract right, does not diminish the estate. *DuVoisin v. Foster (In re Southern Industrial Banking Corporation),* 48 B.R. 306, 309 (Bankr. E.D.Tenn.1985). An action founded on the trustee's avoiding powers is a core proceeding over which this court has jurisdiction to enter a final judgment. 28 U.S.C. § 157(b)(2)(F). Conversely, "actions to collect prepetition accounts receivable are straightforward *Marathon [Pipeline]—* type contract actions and are, thus, not core proceedings." 1 *Collier on Bankruptcy,* (15th ed. rev.) ¶ 3.02[4], pg. 3–44. The bankruptcy court's jurisdiction to enter a final judgment in a non-core proceeding is subject to the defendant's consent. 28 U.S.C. § 157(c). An action to enforce a bankruptcy avoiding power must be filed within the time proscribed in § 546(a) of the Bankruptcy Code. An action to enforce a contract right under State law must be filed within the time proscribed by State law, which could exceed the limitation in § 546. 11 U.S.C. § 108(a).

To prevail on a preference claim under § 547, the Plan Agent must establish five elements. The disputed transaction must involve a transfer of property of the debtor (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before the transfer was made; (3) made while the debtor was insolvent; (4) made within 90 days before the commencement of the bankruptcy; and (5) that enabled the creditor to received more than the creditor would have received in a chapter 7 if the transfer had not been made. § 547(b). There is a rebuttable presumption that the debtor was insolvent during the "preference period," specifically the last 90 days before commencement of the bankruptcy. § 547(f).

The Plan Agent cannot satisfy the second element of a preference claim when the transfer of property was made in exchange for an obligation that is independently enforceable under nonbankruptcy law, such as an account receivable, or a promissory note. The transfer was not "for or on account of" an antecedent debt. *Southern Industrial Banking,* 48 B.R. at 308.

In *Southern Industrial Banking,* the defendant, Foster, purchased four "investment certificates" from the debtor for $400,000. The investment certificates matured in 12 weeks and accrued interest of $66,000. About six weeks before the certificates matured, the debtor made a loan to Foster in the amount of $480,956.02, evidenced by a promissory note. The promissory note matured on the same day as the investment certificates. It was collateralized by an assignment of the investment certificates and by "the right of offset against [Foster's] deposit accounts ...." SIBC filed for chapter 11 bankruptcy protection before either obligation came due. When the loan did mature, Foster tendered to SIBC the investment certificates plus a check for $14,956.02 which was the difference between the obligations due on the promissory note and the investment certificates. A chapter 11 trustee was subsequently appointed in the case. The trustee returned Foster's check, rejected the setoff demand, and filed an adversary proceeding to avoid the "loan" to Foster as a preferential transfer. Foster argued that the transaction involved a collateralized loan and asserted his right of setoff under § 553.

Addressing first the "collateralized loan" issue, the bankruptcy court observed,

"The transfer was not in payment of SIBC's existing, antecedent debt under the investment certificates. Rather, the transfer was made in exchange for pres-

ent consideration in the form of defendant's promissory note.... '[T]he mere exchange of property of equal value within the 90 days preceding bankruptcy does not constitute a preference.' [citation omitted.] ... Here the loan transaction was an exchange of property which in no way diminished the debtor's estate. As such, it does not amount to an avoidable preferential transfer under § 547(b)."

*Southern Industrial Banking*, 48 B.R. at 308–09.

The bankruptcy court in *Southern Industrial Banking* concluded that the loan obligation was not avoidable under § 547. Neither was the loan eligible for setoff against the investment certificates pursuant to § 553(a)(3) because the loan was made within 90 days before commencement of the bankruptcy *for the purpose of obtaining a right of setoff against the debtor.*[5] In support of this result, the court looked to the express terms of the promissory note and security documents which matured on the same date as the investment certificates, and which expressly contemplated repayment of the note through assignment of the certificates. Further, Foster admitted in his responsive pleadings that be intended to repay the promissory note with the proceeds of the investment certificates.

In the end, the trustee prevailed against Foster, but not on a preference theory—the trustee prevailed because Foster owed an obligation to SIBC, evidenced by a matured promissory note, which Foster could not offset against SIBC's obligation under the investment certificates.

The Fifth Circuit Court of Appeals looked at the preference versus setoff issue and reached essentially the same result in *Braniff Airways, Inc. v. Exxon Company, U.S.A. (In re Braniff Airways)*, 814 F.2d 1030 (5th Cir.1987). The doctrine of setoff allows mutual debts to cancel each other. "These debts may arise either from separate transactions or a single transaction but must be incurred prior to the filing of a bankruptcy petition." *Sims v. United States Department of Health and Human Services (In re TLC Hospitals, Inc.)*, 224 F.3d 1008, 1011 (9th Cir.2000), citing 5 *Collier on Bankruptcy*, (15th ed. rev.) ¶ 553.10, pg. 553–100.

Braniff Airways prepaid Exxon for the purchase of jet fuel. Braniff also purchased other products from Exxon on open account. Braniff made substantial payments on the open account during the preference period. When Braniff filed for bankruptcy protection, its prepaid fuel account had a credit balance in excess of $433,000. Braniff sued Exxon to recover some of the open account payments as preferential transfers. Exxon argued that it had a right to setoff the open account against the prepaid fuel account when the preferential payments were made. The right of setoff made Exxon a secured creditor pursuant to § 506(a). *Braniff Airways*, 814 F.2d at 1040. If Exxon was secured by a right of setoff, then Braniff could not establish the fifth element of its

---

5. Bankruptcy Code § 553(a) preserves a creditor's right to offset mutual pre-petition debts owing between the creditor and the debtor, except to the extent that—

   ...

   (3) the debt owed to the debtor by such creditor was incurred by such creditor—
     (A) after 90 days before the date of the filing of the petition;

     (B) while the debtor was insolvent; and
     (C) *for the purpose of obtaining a right of setoff against the debtor.* (emphasis added.)

   For the purposes of § 553, the debtor is presumed to have been insolvent during the last 90 days before commencement of the bankruptcy. § 553(c).

preference claim; that Exxon received more than it would have received in a chapter 7 proceeding if the payments had not been made. The court summarized the relationship between § 547 and § 553 as follows:

> "When § 553 is determined to be applicable, § 547 cannot thereafter be utilized to undo its effect. The enactment of § 553 was an expression of the Congressional intent sanctioning the exercise of setoff as a permissible preference under certain circumstances."

*Braniff Airways,* 814 F.2d at 1034, citing *In re Brooks Farms,* 70 B.R. 368 (Bankr. E.D.Wis.1987).

The court remanded the case for further proceedings to determine whether Exxon had improved its position by exercising a setoff that was avoidable under of § 553(b).[6] If Braniff ultimately prevailed against Exxon, it was not under § 547. Braniff's prepaid fuel account and its open book account with Exxon were mutual prepetition obligations, giving rise to a potential setoff situation. Therefore, Braniff's right to recover against Exxon, if any, was under § 553.

Based on *Braniff Airways* and *Southern Industrial Banking,* it is the court's conclusion that the Plan Agent cannot collect Coast Grain's accounts receivable from Bouma as preferential transfers. A prepetition transfer of property of the debtor may not be avoided under § 547 if the transfer was made in exchange for an asset or property right of equal value, or if the transfer was made in satisfaction of an obligation secured by the right of setoff. Both of those situations existed here. Coast Grain's sales of dairy feed to Bouma, and the third-party payments made for Bouma's benefit, generated contract rights against Bouma of equal value. Bouma's liability for those contracts and Coast Grain's liability on the prepaid account were mutual obligations subject to potential setoff. The actual "transfer of property of the debtor" occurred each time Coast Grain gave up the right to collect its accounts receivable, when Coast Grain debited its claim against Bouma's prepaid account. At that time, Bouma was potentially secured by its right of setoff pursuant to § 506(a). If Bouma improved its position through these debits, then the Plan Agent's right to recover from Bouma is through avoidance of the setoff, the debit transaction, under § 553(b). The Plan Agent did not move for summary judgment under § 553(b) and resolution of that issue will require further proceedings.

### Bouma is Barred From Offsetting the Purposes Made After the Prepay Termination

■ Bouma continued to purchase products from Coast Grain after August 25, 2001, when Coast Grain announced the Prepay Termination. Section 553(b) does not apply after the Prepay Termination because Coast Grain ceased debiting the prepaid accounts. The Plan Agent seeks to collect these accounts receivable and

---

6. Bankruptcy Code § 553(b) provides in pertinent part:

(b)(1) ... if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and
(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.
(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

Bouma asserts the right of setoff against its prepaid account pursuant to § 553(a).

■ Bankruptcy Code § 553(a)(3) prohibits the exercise of a setoff when the creditor's obligation to the debtor is incurred within 90 days before the bankruptcy *for the purpose of creating a setoff right.* Here, the declaration of Bouma's managing partner, John Schoneveld offered in support of Bouma's affirmative defenses, establishes that Bouma chose to disregard the Prepay Termination. Bouma continued to purchase dairy feed for months after the Prepay Termination and commencement of the bankruptcy, with the intent to offset those purchases against the prepaid account. It is clear from Mr. Schoneveld's testimony that Bouma exercised its right of setoff and considered the setoff complete as of December 6, 2001, when Bouma tendered a check to Coast Grain for "the difference." Any prepetition setoffs by Bouma after the Prepay Termination are subject to the prohibition of § 553(a)(3). Any postpetition setoffs by Bouma would have violated the automatic stay. § 362(a)(6) & (7); 3 *Collier on Bankruptcy,* (15th ed. rev.) ¶ 362.03[8][a]—362.03[9], pgs. 362–32–37. Accordingly, the setoff defense is not available to Bouma for products purchased after the Prepay Termination.

### The Recoupment Defense Is Unavailable to Bouma

■ In its seventh affirmative defense, Bouma seeks to recoup the pre and postpetition sales of product against the unused portion of its prepaid account. Bouma contends that recoupment is a complete defense to all of the Plan Agent's claims. The Plan Agent responds that recoupment is not available to Bouma as a matter of law. Both parties have moved for summary adjudication of the recoupment issue.

The Bankruptcy Code does not mention or define the term "recoupment." It has been defined as, "[t]he withholding, for equitable reasons, of all or part of something that is due." Black's Law Dictionary 1302 (8th ed.2004). The bankruptcy courts have recognized the doctrine of recoupment as "the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *Newbery Corporation v. Fireman's Fund Ins. Co. (In re Newbery Corp.),* 95 F.3d 1392, 1399 (9th Cir.1996).

■ Recoupment is an equitable doctrine. *Id.* at 1401. It has been explained and distinguished from the setoff defense as follows:

The main distinction between the doctrines of setoff and recoupment is that setoff is a form of cross action that depends in its application upon the existence of two separate, mutual obligations. Absent a right of setoff, each obligation would be independently enforceable. Moreover, rights of setoff most often arise between obligations stemming from separate transactions or events . . . .

In contrast, recoupment is in the nature of a right to reduce the amount of a claim, and does not involve establishing the existence of independent obligations. By definition, recoupment may arise only out of the "same transaction" or occurrence that gives rise to the liability sought to be reduced.

Recoupment often arises in contract cases, but it is not limited to contractual obligations, nor must the amount to be recouped be liquidated in order for the right to apply. Mutuality is also not required, and the relevant obligations need not both be prepetition in nature. Moreover, although the courts are split

on the issue, the better view is that the automatic stay does not apply to bar or restrain a legitimate right of recoupment because, properly construed, recoupment applies to define the obligation in question, rather than establish or enforce a separate debt.

5 *Collier on Bankruptcy,* (15th ed. rev.) ¶ 553.10, pg. 553–99–100.

The Supreme Court has observed that "a bankruptcy defendant can seek recoupment by meeting a plaintiff-debtor's claim with a counter claim arising out of the same transaction." *Reiter v. Cooper,* 507 U.S. 258, 265 n. 2, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). In *Reiter,* the Court also observed that "[r]ecoupment permits a determination of the 'just and proper liability on the main issue' and involves 'no element of preference.'" *Id.* at n. 2, citing 4 *Collier on Bankruptcy,* ¶ 553.03, pg. 553–17 (15th ed.1991).

■ The Ninth Circuit Court of Appeals has also observed that recoupment does not run afoul of the Bankruptcy Code's ratable distribution policy. *Newbery Corp.,* 95 F.3d at 1398. The recoupment doctrine draws its authority from principles of equity and is thereby subject to the facts in each individual case. Recoupment "is allowed 'because it would be inequitable not to allow the defendant to recoup those payments against the debtor's subsequent claim.'" *Aetna U.S. Healthcare, Inc. v. Madigan (In re Madigan),* 270 B.R. 749, 754 (9th Cir. BAP 2001) citing *Newbery Corp.,* 95 F.3d at 1401.

■ For recoupment to apply, the competing claims must arise out of the "same transaction" or occurrence. *Newbery Corp.,* 95 F.3d at 1399. *See also TLC Hospitals, Inc.,* 224 F.3d at 1011. To determine whether the claims arise from the same transaction, the Ninth Circuit has adopted a "logical relationship" test. *Madigan,* 270 B.R. at 755. *See also Newbery Corp.,* 95 F.3d at 1402; *TLC Hospitals,* 224 F.3d at 1012. The term "transaction" is flexible under the logical relationship test. *Newbery Corp.,* 95 F.3d at 1402. Courts applying this standard "have permitted a variety of obligations to be recouped against each other, requiring only that the obligations be sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party." *Madigan,* 270 B.R. at 755, *citing* 5 *Collier on Bankruptcy,* ¶ 553.10[1].

■ The concept of a "logical relationship" is not unrestrained. The Ninth Circuit has expressly cautioned that, generally, in the commercial setting, the "logical relationship" concept should not be applied "so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction." *Madigan,* 270 B.R. at 757, citing *TLC Hospitals,* 224 F.3d at 1012.

In *Newbery Corp.,* the chapter 11 debtor had defaulted on a bonded construction project. Newbery Corp. then entered into an agreement with its lender and its surety, Fireman's Fund, whereby Fireman's Fund would complete Newbery's unfinished projects using the lender's collateral, Newbery's equipment. Fireman's Fund agreed to pay rent to the lender for use of the equipment. The projects were completed but Fireman's Fund failed to pay the rent. In the course of the chapter 11 proceeding, the lender assigned its rental claim back to Newbery. Newbery sued for the rent and Fireman's Fund moved for summary judgment on the defense of recoupment—Fireman's Fund sought to recoup its losses on the defaulted bonds against the rental obligation. Ruling in favor of Fireman's Fund, the court reasoned that the rent obligation stemmed

directly from Newbery's default of the bonded contract. Applying the logical relationship test, the court held that Newbery's claim for equipment rental and Fireman's Fund's claim for indemnification arose from the same transaction. *Id.* at 1403.

In *TLC Hospitals,* the debtor was a Medicare provider under contract with the U.S. Dept. of Health and Human Services ("HHS"). The court allowed HHS to recoup pre-petition Medicare overpayments from postpetition Medicare estimated payments. The court examined the terms of the Medicare provider agreement and its statutory and regulatory underpinnings. It concluded that the Medicare system, which contemplated the making of estimated payments by HHS, and post-audit adjustments to reimburse HHS for overpayments, did constitute a single transaction for purposes of recoupment even though the separate components of the transaction occurred at different times. *TLC Hospitals,* 224 F.3d at 1012.

In both *Newbery Corp.* and *TLC Hospitals,* the court looked, *inter alia,* to the legal obligations of the parties as the foundation for a "logical relationship" between the competing claims. Here, it is undisputed that the "understanding" between Bouma and Coast Grain regarding Bouma's prepayment in December 2000 was *never reduced to writing.* At the time of the prepayment, Bouma and Coast Grain were mutually committed to one contract for the purchase of dairy feed, a contract which the parties entered into in early August 2000, for the delivery of product beginning in October 2000. Arguably, some of Bouma's prepayment could be construed as a "tender of performance" for the uncompleted portion of that obligation, but the Plan Agent is not seeking to recover all of the prepayment. Bouma offered no evidence to show that any performance

was still due under the August 2000 contract within the relevant period; 90 days prior to the bankruptcy. Indeed, the evidence suggests that all of Bouma's feed purchases during that time were contracted on a "spot market" basis.

This court cannot connect Bouma's prepayment to the subsequent purchases and third-party payments to find a "logical relationship" sufficient to support the doctrine of recoupment. The opposing obligations between Bouma and Coast Grain were effectuated as separate and distinct contracts in the continuous commercial relationship between the parties. At the time of the prepayment, Bouma was not legally obligated to purchase $1.5 million of product from Coast Grain. Neither was Coast Grain legally obligated to sell $1.5 million of product to Bouma. Those contracts came into existence months later, when Bouma purchased dairy feed on the "spot market." Coast Grain clearly was under no legal obligation to make third-party payments to Bouma's vendors—the court can describe that activity as nothing more than a gratuitous accommodation to Coast Grain's customers, a marketing ploy to promote participation in the prepayment program.

In *Newbery Corp.,* the court, in essence, applied a "proximate cause" test to connect the competing claims—but for Newbery's breach of the construction contract, Fireman's Fund would not have had to rent the equipment. The court also noted that Newbery was contractually obligated to indemnify Fireman's Fund for its losses. The opposing claims arose from and were "intertwined" by the same contracts and acts of the parties. *Newbery Corp.,* 95 F.3d at 1403. Similarly, in *TLC Hospitals,* the court found evidence of Congressional intent to connect the estimated payment and post-audit reimbursement transactions based on the contracts and Medicare's

statutory scheme. *In re TLC Hospitals,* 224 F.3d at 1013 (citing *United States v. Consumer Health Servs. of Am., Inc.,* 108 F.3d 390, 395 (D.C.Cir.1997)). The "logical relationship" was rooted in that foundation. Here, Bouma has not shown that the opposing claims in this case had any casual connection, or that they were intertwined by anything but an unwritten, noncommittal, amorphous "understanding" based on their prior course of business.

For Bouma to successfully recoup its obligations to Coast Grain against the prepaid account, the "logical relationship" between the competing claims must be substantially more than an ethereal "understanding." At a minimum, Bouma needed to establish that the prepayment to its account in December 2000 also had a legally cognizable relationship to the subsequent sales of goods and services which the Plan Agent seeks to enforce in this adversary proceeding.[7] No other application of the recoupment doctrine would be consistent with *Newbery Corp.* and *TLC Hospitals.* The loosely knit structure of Bouma's commercial relationship with Coast Grain, and the lack of a definitive agreement to memorialize the terms by which Bouma would voluntarily release $1.5 million to Coast Grain, simply fails Bouma in that effort.

Nor do the undisputed facts of this case suggest that it is inequitable to deny Bouma's bid for recoupment. Coast Grain's liability to Bouma on the prepaid account was no different than any other debtor's obligations to its creditors during the last 90 days before commencement of the case. Bouma had a right to file a claim and participate in the chapter 11 process based on that liability. The fact that Bouma should now have to pay for goods and services it purchased from Coast Grain, contractual commitments made long after the prepayment, is not inconsistent with the Plan Agent's duty to gather the assets of the estate and the Bankruptcy Code's policy favoring the ratable distribution of assets. Bouma had the burden to produce competent evidence to support its recoupment defense. The court is not persuaded that Bouma's prepayment in December 2000, and the subsequent purchases and third-party payments which benefitted Bouma months later had such a "logical relationship" that they should be deemed to constitute the "same transaction."

### Conclusion

Based on the foregoing, the court finds and concludes that the prepetition feed sales to Bouma, and the third-party payments to Bouma's vendors were not preferential transfers avoidable under § 547. The Plan Agent's rights against Bouma are in the nature of contract enforcement claims, subject to whatever defenses—setoff, recoupment, etc.—that may be applicable. It follows, therefore, that Bouma's "ordinary course of business" defense has no application to this case. Accordingly, Bouma's motion for summary adjudication of its third affirmative defense will be DENIED.

Bouma purchased products from Coast Grain after the Prepay Termination for the purpose of exercising a right of setoff against Coast Grain. Therefore, § 553(a)(3) bars Bouma from exercising a setoff of those transactions against its prepaid account. The Plan Agent's motion for summary adjudication of Bouma's sixth affirmative defense will be GRANTED in favor of the Plan Agent.

---

7. As a caveat, the court is not suggesting here that recoupment would automatically apply if the competing claims were contractually linked. Recoupment is an equitable doctrine which may be denied based on the parties' conduct or other "equitable" factors which the court does not need to address here.

With regard to Bouma's recoupment defense, the Plan Agent has established that the competing claims were not a "single transaction." Accordingly, the Plan Agent's motion for summary adjudication of Bouma's seventh affirmative defense will be GRANTED in favor of the Plan Agent.